## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HUMAN RIGHTS WATCH,

               Plaintiff,

     v.

DEPARTMENT OF JUSTICE FEDERAL
BUREAU OF PRISONS,

               Defendant.

No. 13 Civ. 7360 (JPO)

ECF Case

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Jonathan Manes, Supervising Attorney
David A. Schulz, Supervising Attorney
Nicholas Handler, Law Student Intern
Raymond Lu, Law Student Intern
Ajay Ravichandran, Law Student Intern
Alexander Resar, Law Student Intern
Rumela Roy, Law Student Intern
MEDIA FREEDOM AND INFORMATION
ACCESS CLINIC, YALE LAW SCHOOL
P.O. Box 208215
New Haven, CT 06520-8215
Tel: (203) 432-9387
Fax: (203) 432-3034

*Counsel for the Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 2

    A.    BOP's Treatment of Individuals Suspected of Terrorism Has Raised Concerns About Serious Human Rights Violations. ................................ 2

    B.    HRW's FOIA Requests Seeking Basic Data From BOP Went Unanswered for 14 Months Despite HRW's Persistent Efforts...................................... 3

    C.    After HRW Filed Suit, The Parties Engaged in Court-Ordered Negotiations And Reached Agreement Over the Scope of BOP's Searches and Productions. ........................................................................................... 4

    D.    BOP Continues to Redact Important Information. ................................... 5

ARGUMENT ...................................................................................................................... 7

I.    FOIA MANDATES A STRONG PRESUMPTION IN FAVOR OF DISCLOSURE. ........................................................................................... 7

II.    BOP HAS IMPROPERLY WITHHELD RECORDS UNDER EXEMPTIONS 6, 7(C), AND 7(E). ........................................................... 8

    A.    BOP Cannot Invoke Exemption 7 To Withhold Numerous Records That Were Not Compiled for Law Enforcement Purposes. ............................... 8

    B.    BOP's Redactions Are Not Authorized by FOIA's Privacy Exemptions............ 10

        1.    There is no privacy interest in the de-identified information HRW seeks. ........................................................................................... 11

        2.    The public interest in disclosure outweighs any privacy interests at stake. ........................................................................................... 13

    C.    BOP's Redactions Are Not Authorized Under Exemption 7(E). ........................ 16

III.    BOP'S COMPLETE RELIANCE ON AN *EX PARTE* DECLARATION TO JUSTIFY CERTAIN REDACTIONS IS INCONSISTENT WITH FOIA....................................................................................................... 20

IV.    BOP HAS IMPROPERLY WITHHELD AND REDACTED DOCUMENTS ON THE GROUNDS THAT THEY ARE "NONRESPONSIVE" ........................... 22

V.    THE COURT SHOULD CONDUCT *IN CAMERA* REVIEW. ................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*ACLU of N. Cal. v. Dep't of Justice,*
__ F. Supp.3d __, 2014 WL 4954277 (N.D. Cal. 2014) ........................................................ 23

*ACLU v. Dep't of Justice,*
655 F.3d 1 (D.C. Cir. 2011) ........................................................ 14

*ACLU v. Dep't of Defense,*
543 F.3d 59 (2d Cir. 2008) ........................................................ 22

*ACLU v. Dep't of Homeland Sec.,*
973 F. Supp. 2d 306 (S.D.N.Y. 2013) ........................................................ passim

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.,*
626 F.3d 678 (2d Cir. 2010) ........................................................ 16, 17

*Allen v. CIA,*
636 F.2d 1287 (D.C. Cir. 1980) ........................................................ 25

*Am. Immigration Council v. Dep't of Homeland Sec.,*
950 F. Supp. 2d 221 (D.D.C. 2013) ........................................................ 17, 23

*Assoc. Press v. Dep't of Def.,*
554 F.3d 274 (2d Cir. 2009) ........................................................ 10, 12, 13

*Benavides v. Bureau of Prisons,*
774 F. Supp. 2d 141 (D.D.C. 2011) ........................................................ 9, 10

*Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.,*
601 F.3d 143 (2d Cir. 2010) ........................................................ 8

*Bryant v. Maffuci,*
923 F.2d 979 (2d Cir. 1991) ........................................................ 8

*Campbell v. Dep't of Health & Human Servs.,*
682 F.2d 256 (D.C. Cir. 1982) ........................................................ 21

*Citizens for Responsibility & Ethics in Washington v. Dep't of Justice,*
746 F.3d 1082 (D.C. Cir. 2014) ........................................................ 14

*Clemente v. FBI,*
741 F. Supp. 2d 64 (D.D.C. 2010) ........................................................ 17

*Cowsen-El v. Dep't of Justice,*
826 F. Supp. 532 (D.D.C. 1992) ........................................................ 9

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ............................................................................ 11

*Dep't of Justice v. Reporters Comm. For Freedom of Press*,
   489 U.S. 749 (1989) ............................................................................ 13

*Dep't of Defense v. ACLU*,
   558 U.S. 1042 (2009) .......................................................................... 22

*Dep't of State v. Ray*,
   502 U.S. 164 (1991) ........................................................................ 8, 11

*Dep't of the Interior v. Klamath Water Users Prot. Ass'n*,
   532 U.S. 1 (2001) ................................................................................ 22

*Dettmann v. Dep't of Justice*,
   802 F.2d 1472 (D.C. Cir. 1986) ........................................................ 24

*El Badrawi v. Dep't of Homeland Sec*,
   583 F. Supp. 2d 285 (D. Conn. 2008) ............................................... 21

*Families for Freedom v. U.S. Customs & Border Prot.*,
   797 F. Supp. 2d 375 (S.D.N.Y. 2011) ............................................... 18

*Fed. Labor Relations Auth. v. Dep't of Veterans Affairs*,
   958 F.2d 503 (2d Cir. 1992) .............................................................. 12

*Grand Central P'ship, Inc. v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999) ................................................................ 7

*Halpern v. FBI*,
   181 F.3d 279 (2d Cir. 1999) ................................................................ 7

*Hudson v. Palmer*,
   468 U.S. 517 (1984) ........................................................................... 13

*Judicial Watch, Inc. v. Food & Drug Admin.*,
   449 F.3d 141 (D.C. Cir. 2006) ........................................................... 13

*Lamont v. Dep't of Justice*,
   475 F. Supp. 761 (S.D.N.Y. 1979) ...................................................... 9

*Lawyers Comm. for Human Rights v. INS*,
   721 F. Supp. 552 (S.D.N.Y. 1989) ......................................... 21, 22, 25

*Life Extension Foundation, Inc. v. IRS.*,
   915 F. Supp. 2d 174 (D.D.C. 2013) ................................................... 21

iii

*Long v. Dep't of Justice*,
    450 F. Supp. 2d 42 (D.D.C. 2006) ............................................................ 22

*Lykins v. Dep't of Justice*,
    725 F.2d 1455 (D.C. Cir. 1984) ............................................................... 20

*Maydak v. Dep't of Justice*,
    362 F. Supp. 2d 316 (D.D.C. 2005) ............................................................ 9

*Muslim Advocates v. Dep't of Justice*,
    833 F. Supp. 2d 106 (D.D.C. 2012) ........................................................... 21

*Nat'l Archives and Records Admin. v. Favish*,
    541 U.S. 157 (2004) ............................................................................ 15

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) ............................................................... 12

*Nat'l Council of La Raza v. Dep't of Justice*,
    411 F.3d 350 (2d Cir. 2005) ................................................................... 7

*New York Times Co. v. Dep't of Justice*,
    872 F. Supp. 2d 309 (S.D.N.Y. 2012) .......................................................... 7

*Norwood v. FAA*,
    993 F.2d 570 (6th Cir. 1993) ................................................................. 11

*Pratt v. Webster*,
    673 F.2d 408 (D.C. Cir. 1982) ................................................................. 9

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978) ............................................................... 25

*Ruotolo v. Dep't of Justice, Tax Div.*,
    53 F.3d 4 (2d Cir. 1995) ....................................................................... 8

*Tereshchuk v. Bureau of Prisons*,
    __ F. Supp. 3d. __, 2014 WL 4637028 (D.D.C. Sept. 16, 2014) ............................... 13

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ............................................................ 22, 25

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60 (2d Cir. 2009) ..................................................................... 7

*Yagman v. Dep't of Justice*,
    No. 13–cv–0354, 2014 WL 1245305 (C.D. Cal. Mar. 22, 2014) ................................. 13

## STATUTES

18 U.S.C. § 3621(a) ........................................................................................... 10

26 U.S.C. § 6103(a) ........................................................................................... 21

5 U.S.C. § 552(a)(4)(B). .................................................................................... 25

5 U.S.C. § 552(b) ............................................................................................... 23

5 U.S.C. § 552(b)(3) .......................................................................................... 21

5 U.S.C. § 552(b)(6) ...................................................................................... 8, 10

5 U.S.C. § 552(b)(7) ...................................................................................... 8, 10

5 U.S.C. § 552(b)(7)(C) ....................................................................................... 8

5 U.S.C. § 552(b)(7)(E) ................................................................................ 16, 20

5 U.S.C. § 552(b)(7)(F) ..................................................................................... 22

5 U.S.C. §552(d) ............................................................................................... 23

## OTHER AUTHORITIES

Amended Complaint, *Benkahla v. Bureau of Prisons*,
    No. 09 Civ. 25 (S.D. Ind. filed July 27, 2009)......................................... 15

Complaint, *Aref v. Holder*,
    No. 10 Civ. 539 (D.D.C. filed Mar. 29, 2010)......................................... 15

### RULES

Fed. R. Evid. 408 ................................................................................................. 5

### REGULATIONS

28 C.F.R. § 540 ................................................................................................. 19

## PRELIMINARY STATEMENT

In this action, Human Rights Watch ("HRW") seeks information from the Bureau of Prisons ("BOP" or "Government") regarding severe restrictions imposed upon prisoners accused of terrorism-related crimes, and the discriminatory imposition of these restrictions on American Muslims. HRW submitted Freedom of Information Act ("FOIA") requests in 2012 as part of a major study documenting human rights violations in the investigation, prosecution, and imprisonment of terrorism suspects in the U.S. criminal justice system. These requests seek basic information about BOP's use of restrictive Communications Management Units ("CMUs") and Special Administrative Measures ("SAMs"), as well as BOP's responses to requests for religious accommodation. Nearly three years after HRW's requests, BOP continues unlawfully to withhold information that is vital to public understanding and oversight of BOP's practices.

CMUs and SAMs impose exceptionally harsh restrictions on prisoners, including severe limitations on human contact, both inside and outside the prison. The public has a strong interest in understanding how these restrictions are being used, and in ensuring that Muslims or others are not singled out for discrimination. HRW's many dozens of interviews and other extensive research provide evidence that BOP makes excessive and potentially discriminatory use of these measures. Yet BOP refuses to disclose basic information, including records that would illuminate why prisoners are subjected to SAMs or CMUs, making it virtually impossible for HRW and the public to understand BOP policy or to investigate these concerns.

BOP's justifications for withholding this information are exceptionally weak. BOP relies principally on Exemptions 6 and 7(C), asserting the privacy interests of inmates as grounds to withhold information about BOP practices. However, HRW does not seek names, register numbers, and other information that would directly identify inmates, obviating any privacy

1

concerns.  Moreover, even if privacy interests were at stake, the powerful public interests in

disclosure would significantly outweigh them.

BOP's other grounds for withholding information are equally unjustified.  BOP invokes

Exemption 7(E), which protects investigative techniques and procedures, to withhold

information that implicates no such techniques or procedures. Indeed, many of BOP's records

cannot be withheld under Exemption 7 at all because they were not compiled for law

enforcement purposes. BOP has also improperly withheld certain information under Exemptions

3, 7(E), 7(F), without providing any public explanation for why those exemptions might apply,

or even identifying the statutory authority it is invoking under Exemption 3. And BOP has

redacted from disclosed documents particular words or phrases that it deemed "non-responsive,"

even though FOIA provides no authority whatsoever to withhold information on this basis. The

Court should deny BOP's motion for summary judgment and order BOP to disclose the

information sought.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    BOP's Treatment of Individuals Suspected of Terrorism Has Raised Concerns About Serious Human Rights Violations.

Human Rights Watch is one of the world's leading human rights organizations. It

conducts rigorous investigations of human rights abuses worldwide, publicizes those abuses, and

advocates against injustices. Declaration of Andrea Prasow ("Prasow Decl.") ¶ 1. In the years

following the attacks of September 11, 2001, HRW and the Human Rights Institute at Columbia

University ("HRI"), which shares a similar mission, became concerned about reports of human

rights abuses in the United States in the investigation, prosecution, and detention of individuals

accused of terrorism or terrorism-related crimes. *Id.* ¶¶ 5-8.

In particular, HRW and HRI received reports that BOP was using harsh methods of isolation against prisoners thought to be linked to terrorism, including placing accused individuals in particularly restrictive housing units, known as CMUs, and subjecting them to SAMs that severely restrict their contact with attorneys, family, friends, the press and the rest of the outside world. *Id.* ¶¶ 7, 12, 14, 19, 23. Detainees in CMUs have no opportunity to challenge their placement. *Id.* ¶ 18. They are under constant surveillance and are forbidden all physical contact with spouses, children, and other family members. *Id.* ¶ 14. Inmates against whom SAMs have been imposed have been forced to spend over a year in pretrial isolation, barred from communicating with other inmates or correctional staff, exercising, or even reading. *Id.* ¶ 22. HRW and HRI are concerned that these measures have been applied disproportionately to American Muslims, reflecting a pattern of discrimination. *Id.* ¶¶ 12, 16, 24-25.

In order to investigate these measures and the possibility of their discriminatory use, in August 2012 HRW and HRI filed the FOIA requests that eventually gave rise to this lawsuit. *Id.* ¶¶ 3-9. Nearly three years later, BOP still refuses to disclose crucial information, including the reasons that have justified imposition of SAMs or placement in CMUs. HRW and HRI have since published a major report documenting human rights abuses in the investigation, prosecution and detention of terrorism suspects in the U.S. criminal justice system. *Id.* Ex. A. But HRW and the public still cannot fully ascertain how BOP uses these harsh administrative measures, let alone investigate the credible evidence that these practices violate human rights standards and disproportionately affect American Muslims. *Id.* ¶¶ 9, 13, 17, 26, 28-29.

**B.    HRW's FOIA Requests Seeking Basic Data From BOP Went Unanswered for 14 Months Despite HRW's Persistent Efforts.**

BOP failed to produce even a single page of responsive information until HRW filed suit fourteen months after submitting the requests, despite HRW's best efforts to negotiate with BOP

in good faith. Declaration of Jonathan Manes ("Manes Decl.") ¶¶ 8-24. For instance, three

months after filing its requests, and after reaching out repeatedly to a BOP FOIA officer, HRW

agreed to identify its highest-priority requests in order to allow BOP to quickly process this "first

tier" of information. *Id.* ¶¶ 14-15.[1] Despite offering repeated verbal assurances, BOP failed to act

on this priority list of requests. *Id.* ¶¶ 11-18. After receiving no response for six months, despite

repeated conversations with BOP, HRW filed an administrative appeal challenging BOP's

constructive denial of its request. *Id.* ¶¶ 19-21. This appeal went unanswered. *Id.* ¶¶ 22-24.

### C.   After HRW Filed Suit, The Parties Engaged in Court-Ordered Negotiations And Reached Agreement Over the Scope of BOP's Search and Productions.

On October 18, 2013, HRW filed suit to enforce its FOIA requests. *Id.* ¶ 25. A month

after the lawsuit was filed, BOP made its first production of records: eighty-eight pages

constituting only a fraction of the information HRW had sought. *Id.* ¶ 27.

Following an initial pre-trial conference, Judge Baer directed that BOP staff confer with

HRW representatives regarding BOP's recordkeeping systems, and that counsel subsequently

negotiate an agreement about the scope of additional searches that BOP would conduct to

respond to HRWs request. *Id.* ¶¶ 29-31, Ex. N. The parties subsequently engaged in protracted

negotiations that ultimately led to a Joint Stipulation and Proposed Order endorsed by Judge

Baer on May 9, 2014.  *Id.* ¶¶ 32-44. The agreement described the additional records BOP would

search for and set deadlines for production. Manes Decl. Ex. O ¶¶ 3-10. The agreement also

specified both that BOP would not engage in "blanket" redaction of material from certain

spreadsheets BOP agreed to produce, *id.* Ex. O ¶ 5, and that BOP would create unique identifiers

for each inmate in those spreadsheets to permit cross-referencing, *id.* Ex. O ¶ 3. In exchange,

---

[1] The Government's brief suggests that the letter memorializing this tiered-search agreement was somehow improper, because it described the categories of records sought in the form of questions.  Gov't Br. 2.  To the contrary, the letter was written specifically to address the BOP's FOIA Officer's concerns by spelling out, in the clearest possible terms, the subset of records in which HRW was most interested.  Manes Decl. ¶¶ 13-15.

HRW agreed not to challenge redactions, made under Exemptions 6 and 7(C), of certain

categories of information that BOP contended were "personally identifiable." *Id*. Ex. O ¶ 2.[2]

D.    **BOP Continues to Redact Important Information.**

BOP completed its production of documents in September 2014, but many of the records

were heavily redacted. These withholdings, challenged here, fall into three categories.

First, BOP has withheld a variety of information about detainees housed in CMUs that is

necessary to understand how BOP assigns inmates to and operates CMUs. BOP invokes

Exemptions 6, 7(C), and 7(E) to redact CMU inmates' Security Threat Group ("STG") status,

criminal charges, associations with terrorist or other organizations, and staff comments regarding

the conduct for which a prisoner was confined to a CMU. BOP also invokes these exemptions to

redact the specific CMUs to which prisoners was sent, as well as each prisoner's Case

Management Coordinator ("CMC") assignment, a way of categorizing the conduct for which an

inmate was confined in a CMU. Public Declaration of Clinton ("Stroble Decl.") ¶ 19.  HRW

seeks access to this information both to understand how CMUs operate and to investigate

potentially discriminatory assignments to CMUs. Prasow Decl. ¶¶ 8-9, 12-18.

Second, BOP has refused to release information concerning its use of SAMs.  BOP

invokes Exemptions 6 and 7(C) to redact the specific facts supporting the decision to impose

SAMs restrictions; the charge and sentence information of inmates subjected to SAMs; the U.S.

---

[2] Contrary to the Government's suggestion, HRW's agreement not to challenge the redaction of certain information under Exemption 6 and 7(C) does not constitute a concession that such redactions are proper or lawful, or that the alleged privacy interests of inmates and third parties outweigh the public interest in disclosing personally identifiable information in these records. Gov't Br. 4, 10. Rather, HRW's specific concessions were made only in exchange for BOP's agreement to create anonymous identifiers for each inmate that would allow data about an inmate to be cross-referenced from one spreadsheet to another. Manes Decl. ¶¶ 32-45. Without these identifiers, HRW would have been unable to meaningfully analyze BOP's spreadsheets of inmates in CMUs or SAMs. *Id.* ¶¶ 35-37. At no point did HRW concede that BOP's redactions were lawful; the agreement was merely an artifact of negotiations. *Id* .¶¶ 36, 45. Note that to the extent this discussion recounts events that the government regards as settlement communications, it does not violate Fed. R. Evid. 408 because this discussion is not intended to "prove liability" or "invalidity of the claim" but is "for another purpose*," i.e.* to rebut the Government's false suggestion that HRW's agreement to waive its right to challenge certain privacy redactions constituted an admission that such redactions were justified or proper. Gov't Br. 4, 10.

Attorney's Office handling each inmate's case; inmates' status; place of incarceration; effective dates of SAMs; and facts related to the authorization request, including the date of renewal request. Declaration of Gail A. Brodfuehrer ("Brodfuehrer Decl.") ¶ 13, Ex. 1 ECF No. 33; Declaration of Vanessa R. Brinkmann ("Brinkmann Decl.") ¶ 7, Ex. B ECF No. 36.  Access to the reasons why SAMs are imposed and other basic information about inmates subject to SAMs is necessary in order for HRW and the public to understand how BOP uses SAMs and to investigate reported abuses of this authority. Prasow Decl. ¶¶ 19-26. Indeed, there is a special public interest in access to this information because individuals subject to SAM orders appear to be prohibited from discussing their terms.  Prasow Decl. ¶ 26, Ex. A, at 141.

Third, BOP has withheld information concerning requests for religious accommodations. Stroble Decl. Ex. 2, at 3-14 ECF No. 35 (redacting documents Bates-stamped BOP000347- BOP000388, BOP000266- BOP000346). For CMU inmates seeking religious accommodations, the agency has invoked Exemption 6 and 7(C) to redact: the TRULINCs codes and identifiers that inmates and prison staff use to communicate, inmate job and cell assignments, the name of a BOP official about whom an inmate complained, and the name and address of a bookstore from which an inmate requested meat satisfying Islamic dietary restrictions. *Id.* ¶ 20. BOP has also asserted Exemption 7(E) to justify the above redactions, with the exception of the name of a BOP official subject to a complaint. *Id.* ¶ 27. HRW requires access to information concerning requests for religious accommodations to determine if Islamic religious accommodations were withheld because of anti-Muslim bias. Prasow Decl. ¶¶ 8-9, 16-17.

In addition to these three categories, BOP has withheld various responsive documents on the grounds that particular words or phrases are "non-responsive" to HRW's requests. Stroble Decl. ¶ 31; Manes Decl. ¶¶ 47-49, Ex. C. It has failed to provide justifications for redactions

contained in documents that it has belatedly and unilaterally determined are non-responsive in their entirety. Manes. Decl. ¶ 50. And with respect to two "Key Indicators documents," which describe the housing capacity of two BOP facilities, BOP has redacted unspecified information under Exemptions 7(E) and 7(F), as well as Exemption 3.  Stroble Decl. ¶ 30, Ex. 2, at 1. The entirety of BOP's justification for these withholdings is made in an *ex parte* declaration. BOP has failed even to publicly specify which statute it relies on to invoke Exemption 3. *Id.*

## ARGUMENT

## I.   FOIA MANDATES A STRONG PRESUMPTION IN FAVOR OF DISCLOSURE.

FOIA was enacted to "promote honest and open government and to assure the existence of an informed citizenry [in order] to hold the governors accountable to the governed."[3] *Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation and citation omitted). Contrary to the Government's suggestions, Gov't Br. 6, FOIA strongly favors a policy of disclosure. *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). FOIA requires the Government to disclose its records unless they fall within one of the specific, enumerated exemptions set forth in the Act, which are to be narrowly construed. *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005). Thus, "the agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009) (internal citations omitted). Contrary to the Government's misreading of *Wilner*, Gov't  Br. 7, the Second Circuit has held that an agency must prove "that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements." *Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4, 9 (2d Cir. 1995) (internal

---

[3] HRW has not submitted a Local Rule 56.1 statement, as a Local Civil Rule 56.1 statement is generally not required in FOIA actions in this Circuit. *See, e.g.*, *New York Times Co. v. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012).

quotation and citation omitted). This burden also extends to decisions to redact certain material within documents. *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

Under FOIA, this Court reviews *de novo* any agency decision to withhold information. 5 U.S.C. § 552(a)(4)(B). The "agency's decision that the information is exempt from disclosure receives no deference." *Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 601 F.3d. 143, 147 (2d Cir. 2010). In a FOIA case, as in other litigation, summary judgment is properly granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Bryant v. Maffuci*, 923 F.2d 979, 982 (2d Cir. 1991).

## II.    BOP HAS IMPROPERLY WITHHELD RECORDS UNDER EXEMPTIONS 6, 7(C), AND 7(E).

BOP's redactions of information under Exemptions 6, 7(C) and 7(E) are improper.  First, BOP has withheld routine records of prison administration, which do not meet Exemption 7's threshold requirement of being "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Second, the Government has invoked FOIA's privacy exemptions, 5 U.S.C. § 552(b)(6) and (b)(7)(C), even though all of the information HRW seeks would be de-identified and so implicates no privacy interests.  Even if there were a cognizable privacy interest, it is clearly outweighed by the significant public interest in disclosure here. Finally, the Government has invoked Exemption (7)(E), which is intended to protect sensitive law enforcement techniques, to withhold information that does not implicate investigative techniques at all, or else relates to BOP activities that are already public.

### A.    BOP Cannot Invoke Exemption 7 To Withhold Numerous Records That Were Not Compiled for Law Enforcement Purposes.

Many of BOP's withholdings under FOIA's Exemption 7 are improper because the records in question were not "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). To meet this threshold requirement of Exemption 7, BOP must show, first, that its records are

related "to the enforcement of federal laws or to the maintenance of national security," such that the agency can identify "a particular individual or a particular incident as the object of [the agency's] investigation" and a connection "between that individual or incident and a possible security risk or violation of federal law." *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982). Second, there must be a rational "nexus" between the investigation and one of the agency's law enforcement duties. *Id.* at 421.

Under *Pratt*, Exemption 7 is not met where an agency "was merely monitoring the subject for purposes unrelated to enforcement of federal law" as opposed to "gathering information with the good faith belief that the subject may violate or has violated federal law." *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 773 (S.D.N.Y. 1979). But many of the documents redacted by BOP here relate solely to the routine functioning of prisons or monitoring of inmates, and so fail the *Pratt* test.  For instance, "Key Indicators" records that merely disclose the housing capacity of certain BOP facilities,[4] or records that document inmate complaints to prison administrators,[5] or records that catalogue administrative responses to inmate complaints,[6] do not reflect any investigation into possible violations of law.  Indeed, other courts have found that similar BOP records do not meet the Exemption 7 threshold. *See Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 141 (D.D.C. 2011) (prison telephone billing records not compiled for law enforcement purposes); *Maydak v. Dep't of Justice*, 362 F. Supp. 2d 316 (D.D.C. 2005) (records of inmate recreation, staff names and positions, and inmate psychological profiles did not meet threshold); *Cowsen-El v. Dep't of Justice*, 826 F. Supp. 532, 533-34 (D.D.C. 1992) (inmate medical treatment records did not meet threshold).

Moreover, BOP's invocation of Exemption 7 is entirely conclusory, relying on mere

---

[4] *See* Stroble Decl. Ex. 2, at 1 (documents Bates-stamped BOP000264-BOP000265).
[5] *Id.* at 3-14 (documents Bates-stamped BOP000266-BOP000388).
[6] *Id.* at 2 (documents Bates-stamped BOP000389-BOP000412).

deference to its status as a law enforcement agency. *See* Gov't Br. 9. BOP makes the blanket

assertion that "records originating with BOP are law enforcement records because they were all

compiled in the exercise of BOP's authority under 18 U.S.C. § 3621(a)" to imprison convicts.

Gov't Br. 9.  But this conclusory assertion is precisely what the case law forecloses. *See*

*Benavides*, 774 F. Supp. at 147 (rejecting a "*per se*" application of the Exemption 7 threshold to

BOP records).  Instead, "the fact that the relevant agency's principal purpose is the enforcement

of criminal law does not absolve it of its obligation to demonstrate that the records at issue were

compiled for a law enforcement purpose." *Id.* at 145. BOP's assertion that its "Key Indicators"

documents were compiled for law enforcement purposes merely because they were "compiled as

a management tool," Stroble Decl. ¶ 30, is likewise inadequate, because it fails to identify any

specific investigatory purpose. Because BOP has failed to make such a showing, it cannot invoke

Exemption 7 with respect to many of the records in dispute.[7]

### B.    BOP's Redactions Are Not Authorized by FOIA's Privacy Exemptions.

BOP may not justify its redactions under FOIA's privacy exemptions, 5 U.S.C.

§ 552(b)(6) and (b)(7)(C), as it cannot demonstrate that a "more than *de minimis* privacy interest

is implicated" in the records HRW seeks and that the "balance [of] the public interest in

disclosure against the [privacy] interest" tips in favor of secrecy.  *Assoc. Press v. Dep't of Def.*,

554 F.3d 274, 284-85 (2d Cir. 2009) ("*AP*") (second alteration in original) (internal quotation

omitted).  HRW seeks only de-identified records, so disclosure implicates no cognizable privacy

interests.  Even if a more than *de minimis* privacy interest were at stake, it is outweighed by the

important public interest in understanding how SAMs and CMUs work, and how BOP responds

---

[7] HRW does not contest that documents concerning the criteria for imposing SAMs meet this threshold requirement of Exemption 7, *see* Brodfuehrer Decl. Ex. 1 (documents Bates-stamped CRM000001-CRM000750), Brinkmann Decl. Ex. B (documents Bates-stamped OIP001-OIP116), and similarly concedes that BOP documents Bates-stamped BOP000089-BOP000237, *see* Stroble Decl. Ex. 2, at 14-18, which concern the imposition of SAMs on specific prisoners, meet the threshold. HRW contests the application of Exemption 7 to the rest of the withholdings in dispute.

to allegations of religious discrimination, especially in light of HRW's extensive evidence of potential human rights abuses with respect to these BOP practices.

### 1.   *There is no privacy interest in the de-identified information HRW seeks.*

There is no cognizable privacy interest at stake in the records BOP has withheld because HRW has agreed in the Joint Stipulation not to challenge the redaction of names, ID numbers, and certain other details about inmates. Manes Decl. Ex. O. Disclosure of information that does not identify an individual does not implicate a privacy interest cognizable under either Exemption 6 or Exemption 7(C). *See Dep't of State v. Ray*, 502 U.S. 164, 176 (holding that "disclosure of … personal information constitutes only a *de minimis* invasion of privacy" when the information is not identifying).

In a recent case, this Court held that the privacy exemptions did not apply where none of the withheld information directly identified an individual because "identification … would require an additional and unlikely chain of events," *ACLU v. Dep't of Homeland Sec.*, 973 F. Supp. 2d 306, 315 (S.D.N.Y. 2013) ("*ACLU v. DHS*"), and "the Government offer[ed] no support or explanation for its … assertion that … it would be relatively easy for someone to specifically identify" an individual, *id.* at 316. The same is true here.

The Supreme Court agrees.  In *Dep't of Air Force v. Rose*, the Court emphasized that "Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities" and held that redaction of names and other directly identifying information is sufficient to protect privacy interests even if "redaction cannot eliminate all risks of identifiability." 425 U.S. 352, 380 n.19, 381 (1976). Lower courts, elaborating *Rose*, have found that privacy is implicated only when records (1) "by themselves" identify an individual, *Norwood v. FAA*, 993 F.2d 570, 575 (6th Cir. 1993) (internal quotation omitted), or (2) create a "substantial likelihood" of privacy

11

invasion, *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989).[8]

    BOP's argument depends entirely on its speculative claim that, despite the redaction of names, ID numbers, and other details, disclosure of the material that HRW seeks—such as the generic reasons that SAMs were imposed on an inmate—"could be used to deduce individuals' identities in the context of" publicly available information. Gov't Br. 11-12. BOP's assertion, however, is nothing more than rank speculation.[9]  BOP has not made any showing that identification is likely, as this Court required in *ACLU v. DHS*. 973 F. Supp. 2d at 316 ("The Government has not adequately explained why individual categories of disputed information … implicate privacy concerns.").  For instance, the Government asserts that because there are few SAM's inmates and their cases were well publicized, disclosing withheld information could lead to identification. Brodfuehrer Decl. ¶ 18. But BOP provides no evidence that SAM inmates' names are in fact well known.  And even if the redacted details were specific enough to identify a particular individual, BOP offers no reason to believe that those details—such as the facts that led to the imposition of SAMs, which may well have occurred inside the prison walls—would be known to *anyone* other than prison officials.[10]

    As in *Rose*, this Court must reject the notion that the mere possibility that an individual's

---

[8] This analysis applies equally to Exemptions 6 and 7(C), as the same "measurable interest in privacy" is needed to trigger either exemption, *Fed. Labor Relations Auth. v. Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir. 1992). The main difference between the exemptions, aside from the Exemption 7 threshold requirements, *see supra* § II.A, is that, "[u]nder Exemption 6, … the government's burden in establishing the required invasion of privacy is heavier than the burden in establishing invasion of privacy under Exemption (7)(C)." *AP*, 554 F.3d at 291.  So if BOP's exemption 7(C) claims fail, its Exemption 6 claims must fail too.

[9] BOP is not even able to maintain a consistent position on which information creates this speculative potential for identification. BOP maintains, with respect to certain records, that "information regarding the effective dates of the SAM" is identifying and so can be withheld. Brodfuehrer Decl. ¶ 18 n.2. But the Government has described precisely this information in other regardes related to HRW. *See, e.g.*, Manes Decl. Ex. A

[10] BOP suggests in a footnote that BOP personnel could discover inmate identities through internet searches using unspecified combinations of redacted information. Brodfuehrer Decl. ¶ 18 n.2. The footnote fails even to specify which pieces of information were searched, which results were taken to establish an "identity," or whether some pieces of information *did not* return any inmate names when searched.  This *ad hoc* and unsystematic experiment by BOP employees—who presumably already has access to the names in question when choosing search terms—simply does not show that there is a "substantial likelihood" that *any and all* of the redacted information would be identifying when released.

identity could be ascertained is sufficient to establish a cognizable privacy interest under FOIA.[11]

### 2. The public interest in disclosure outweighs any privacy interests at stake.

Even if the redacted information implicates cognizable privacy interests, which it does

not, it is still improperly withheld because the public's interest in disclosure far outweighs those

privacy interests. *See, e.g.*, *AP*, 554 F.3d at 284.  As an initial matter, any privacy interest at

stake is exceedingly small because disclosure of de-identified information is very unlikely to

lead to re-identification, *see supra* § II.B.1, and because inmates in any case have a diminished

privacy interest in disclosure of the circumstances of their detention.[12] Set against this meager

privacy interest is an overwhelmingly strong public interest in disclosure.

Citizens have a powerful interest in understanding how BOP's special prison restrictions

work. To understand any government program, one must know the factors officials weigh when

administering its benefits and burdens. Publicly available criteria for placing inmates in CMUs

and imposing SAMs are so vague as to be meaningless in the absence of information about

which charges, prison conduct, or other specific evidence the agency considers when applying

the restrictions to inmates, all of which BOP continues to withhold. See Prasow Decl. ¶ 21 (for

SAMs), ¶ 13 (for CMUs); Manes Decl. Ex. E. Disclosure of the factors (such as conduct, charge

and sentence, or group associations) that have led to the imposition of SAMs and confinement to

---

[11] None of the cases cited by BOP are on point; they all concern disclosure of directly identifying information such as names and addresses. Gov't Br. 12. *See Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 757 (1989)  (information on named individuals exempt); *AP*, 549 F.3d at 291-92 (names of detainees and their family members exempt); *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 153 (D.C. Cir. 2006) (names and addresses of agency personnel exempt); *Tereshchuk v. Bureau of Prisons*, __ F. Supp. 3d. __, 2014 WL 4637028, at *3 (D.D.C. Sept. 16, 2014) (inmate names and register numbers exempt); *Yagman v. Dep't of Justice*, No. 13–cv–0354, 2014 WL 1245305, at *9 (C.D. Cal. Mar. 22, 2014) (list containing names of inmates exempt).
[12] *See, e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984). Contrary to the Government's assertion, Gov't Br. 13, the records at issue here, which merely concern the restrictions to which BOP has subjected inmates, do not contain the sort of highly sensitive inmate information the Second Circuit has found to be protected by FOIA.  *Compare AP*, 554 F.3d at 287-88 (holding that Guantanamo detainees retained a privacy interest in disclosure of records that would reveal they were victims and perpetrators of abuse). Disclosing information such as cell and job assignments or the reasons and duration for which SAMs were imposed would not "subject them to embarrassment and humiliation." *Id.* at 288.

CMUs is thus essential to understanding how these programs work. Moreover, SAMs raise unique transparency concerns because they "ordinarily prohibit defendants, attorneys, and their families from communicating about the SAMs to each other—or anyone else." See Prasow Decl. Ex. A, at 141. Disclosure of information that would illuminate the criteria used to impose SAMs is thus essential for the public to understand how SAMs are used.

The public also has a strong interest in understanding how prosecutors and BOP cooperate to apply and administer SAMs. Pretrial use of SAMs has the potential to interfere with trial preparation by defense attorneys. See *Id*. ¶¶ 25-26. Disclosure of information such as the U.S. Attorney's Office handling specific SAM inmates would allow citizens to evaluate how particular offices are dealing with suspected or convicted terrorists in custody.

Such "matters of substantive law enforcement policy" implicate a public interest weighty enough to require disclosure. *See ACLU v. Dep't of Justice*, 655 F.3d 1, 14-16 (D.C. Cir. 2011) ("*ACLU v. DOJ*"); *see also Citizens for Responsibility & Ethics in Washington v. Dep't of Justice*, 746 F.3d 1082, 1095-96 (D.C. Cir. 2014) ("*CREW*"). Citizens have an overriding interest in knowing "what … policy is [with respect to a method of police investigation] and how effective or intrusive it is," *ACLU v. DOJ*, 655 F.3d at 14, and also "how … the DOJ handle[s] the … prosecution of [certain] crimes," *CREW*, 746 F.3d at 1093. The same reasoning requires disclosure of the redacted information here.

Disclosure would also permit HRW to further investigate its well-documented concerns that BOP is imposing excessive sanctions and discriminating against American Muslims through its policies on SAMs, CMUs, and religious accommodations. HRW's interviews with prisoners subject to SAMs indicate that BOP uses the program to impose restrictions on activities with a tenuous connection to the security and confidentiality interests which the measures purportedly

14

exist to protect, such as purchasing food and receiving widely available books.  Prasow Decl. ¶¶ 22-24, Ex. A, at 144-51. Muslim prisoners in CMUs have revealed that they were subjected to religiously based harassment and discrimination by guards and denied access to religious accommodations and medical treatment provided to non-Muslims. *Id.* ¶ 16, Ex. A, at 139-40. Muslims have also made up more than two-thirds of the CMU population even while comprising only 6 percent of the total federal prison population. *See id.* ¶ 12; Manes Decl. Ex. F. HRW has also amassed extensive evidence of discriminatory law enforcement conduct throughout federal terrorism investigations and prosecutions, including obstruction of Muslim prisoners' religious observance in pretrial detention. Prasow Decl. Ex. A, at 117-18; *see also id.* at 21-26. The fact that several CMU inmates have filed two separate suits challenging their confinement is additional evidence that CMUs have been used improperly. *See* Compl., *Aref v. Holder*, No. 10 Civ. 539 (D.D.C. filed Mar. 29, 2010) (use of CMUs violates due process, equal protection, and retaliates against protected religious activity), Am. Compl., *Benkahla v. Bureau of Prisons*, No. 09 Civ. 25 (S.D. Ind. filed July 27, 2009) (use of CMUs violates federal prison regulations).

The public interest in "show[ing] that responsible officials acted negligently or otherwise improperly in the performance of their duties" is weighty enough to overcome even a significant privacy interest. *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004). The detailed evidence of abuse and discrimination documented in HRW's comprehensive 200-page report, Prasow Decl. Ex. A, and the other sources described here is more than sufficient to satisfy *Favish*'s requirement that a FOIA plaintiff can "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174.

The information HRW seeks would allow for further investigation of these concerns. For

instance, HRW needs charges, sentences, associations, and other reasons for imposition of SAMs and CMU confinement to evaluate whether these severe measures are used in an excessive or discriminatory manner. Likewise, information withheld from documents that reflect inmates' requests for religious accommodations, including job and cell assignments, the name of a staff member about whom an inmate complained, and information about a store from which food items were requested as a religious accommodation will enable HRW to determine whether anti-Muslim bias affected how these requests were handled. *Compare* Stroble Decl. ¶¶ 20-21.[13]

Disclosure of all of this information would serve public interests that clearly outweigh the minimal privacy interests, if any, that inmates retain in disclosure of de-identified records.

### C.     BOP's Redactions Are Not Authorized Under Exemption 7(E).

BOP's redactions under Exemption 7(E) are also improper, because the withheld information would not expose investigative "techniques and procedures," or "guidelines for law enforcement investigations [disclosure of which] could . . . risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681-82 (2d Cir. 2010). BOP has broadly invoked Exemption 7(E) to redact two categories of information: material that it claims would identify inmates, and classification codes that it asserts are themselves techniques and procedures. Stroble Decl. ¶¶ 26-27. Neither category of information is protected by Exemption 7(E).[14]

First, BOP has not shown how disclosing information that could lead to the identification

---

[13] The TRULINCs codes and identifiers, which uniquely identify inmates and guards in internal prison messages (but do not appear to be available to the public such that disclosure would publicly identify the inmate), would allow HRW to determine whether many denied requests were submitted by the same inmates or denied by the same officials. Every request sent through the TRULINCs system was denied. *See* Manes Decl. Ex. D.

[14] BOP has invoked Exemption 7(E) to redact the names and register numbers of inmates subject to SAMs. HRW does not contest those redactions because it has agreed not to challenge them under Exemption 6 and 7(C), and so challenging the application of Exemption 7(E) would serve no purpose. *See* Manes Decl. Ex. O. It is worth emphasizing, however, that HRW disagrees with the BOP's contention that such information can be withheld under Exemption 7(E).

of inmates would compromise investigative techniques and procedures or expose guidelines that would risk circumvention of the law. BOP appears to argue that disclosing information such as the offense conduct or job assignments of inmates would expose the identities of those subject to CMUs, which could then be used to glean techniques for investigating inmates or the information gathering process used to make CMU designations. *Id*. This argument fails because it rests on the same speculative claim that de-identified data would lead to the disclosure of inmate names.  *See supra* § II.B.1.

But even if it were possible to re-identify inmates, disclosing identities simply does not reveal "law enforcement techniques."  BOP offers no plausible explanation of how access to the identities of prisoners confined to CMUs—or who have complained of religious discrimination at the hands of BOP staff—would reveal any non-public information about techniques for conducting investigations. BOP has not, and cannot describe "the nature of the techniques" allegedly implicated, *Clemente v. FBI*, 741 F. Supp. 2d 64, 88 (D.D.C. 2010), "the context in which the technique is used", or "why the technique or procedure is not generally known to the public," *Am. Immigration Council v.  Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 247 (D.D.C. 2013), because the inmate information here has no connection with protected investigative techniques. *See, e.g.*, *ACLU v. DHS*, 973 F. Supp. 2d at 318-19.

In addition, BOP does not explain how disclosing information that could in theory lead to inmate identities would reveal "guidelines" for law enforcement and "risk circumvention of the law." In order to come within this prong of 7(E), the disclosed information must, as a threshold matter, constitute a "guideline"—i.e. provide an "indication or outline of future policy or conduct" that guides "resource allocation." *Lowenstein,* 626 F.3d at 682. It is entirely mysterious how disclosure of supposedly identifying information would reveal such guidance.

17

BOP also fails to explain how mere identification of inmates would enable individuals to evade investigations, circumvent communications monitoring, or avoid the imposition of CMUs. Stroble Decl ¶¶ 26B-D. Knowing that certain inmates were previously subjected to CMUs would not reveal how inmates are selected for future investigations, or what non-public techniques BOP uses to monitor them. *See ACLU v. DHS*, 973 F. Supp. 2d at 319; *Families for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 392 (S.D.N.Y. 2011).

Second, BOP cannot sustain its assertion that releasing "STG status, associations, or CMC status of inmates" would "itself reveal law enforcement techniques and procedures." Stroble Decl. ¶ 26D. Classification codes or comments that do not describe the underlying investigative techniques may not be withheld. For instance, in *ACLU v. DHS*, this Court rejected a similar argument to withhold immigration records that included "detainee's medical histories, 'special circumstances' (to continue detention), general comments taken from ICE officials' custody determinations, and national security concerns," holding that release of such information would not reveal "techniques and procedures." 973 F. Supp. 2d at 318.  BOP has failed to show that merely knowing that an inmate "an inmate is subject to separation from other inmates" or "has disruptive group affiliations" would reveal *how* BOP officials make such a determination. Stroble Decl ¶ 26. Nor do these codes constitute "guidelines" disclosure of which could risk "circumvention of law." *ACLU v. DHS*, 973 F. Supp. 2d at 319 (finding, with respect to the ICE codes described above, that "the Government has not provided sufficient evidence that the redacted data constitute guidelines.") (internal quotation omitted).

BOP's contention that disclosure of classification codes such as STG status or CMC assignments would "jeopardize the secure and orderly operation of BOP facilities" is also entirely conclusory. Stroble Decl. ¶ 26D.  Detainees housed in CMUs are already aware that their

calls, emails, letters and other communications are monitored,[15] so it is unclear how disclosing classification codes could enable criminal activity. BOP simply fails to show how disclosure of this information could be used to "tailor any relevant type of conduct or alter any relevant type of information" to circumvent of the law. *ACLU v. DHS,* 973 F. Supp. 2d at 319.

In any case, information about how BOP classifies inmates is already in the public domain, and therefore may not be withheld. In other litigation, BOP has already released internal memoranda evaluating proposed CMU designations for several inmates convicted of terrorism, revealing how BOP staff weigh competing criteria such as charge, sentence, and prison conduct in assigning inmates to CMUs. *See* Manes Decl. Ex. J at 11-12; Ex. K at 2-3, 9-12.[16] These public documents provide far more insight into BOP's allegedly sensitive methodology for imposing CMUs than the inmate information and classification codes the Government has redacted here, undermining the Government's claim to secrecy. *Id.* Similarly, BOP reports analyzing the intercepted communications of "terrorist inmates" placed in CMUs at FCI Terre Haute and USP Marion have been available online since January 2011. *See* Manes Decl. Exs. G-I. Each report includes not only the kind of information sought here—i.e. STG status, affiliations, etc.—but also excerpts of intercepted inmate emails, phone calls, and written correspondence, analysis by BOP staff, and the names of BOP staff assigned to monitor communications. *See* Manes Decl. Ex. G, at 1-8, 16, 19-21; Ex. H, at 1-9, 15, 19, 25, 27-29, 37.

---

[15] The BOP's newly revised regulations on CMUs detail how it intends to ensure "complete monitoring of telephone use, written correspondence, and visiting" and "no unmonitored communication with news media representatives." 28 C.F.R. § 540.

[16] For instance, in the memo titled "CMU Referral," dated February 20, 2011, regarding the proposed redesignation of Daniel McGowan to a CMU, BOP staff justified his placement in a CMU by referring to his attempt to circumvent communications restrictions by having his wife mail in sensitive materials under the guise of attorney-client communication. Manes Decl. Ex. J at 11-12. Similarly, in the memo titled "CMU Referral" and dated March 20, 2011, regarding the proposed transfer of Kifah Jayyousi out of a CMU in FCI Terre Haute, BOP staff indicated that they saw Jayyousi's alleged efforts to radicalize other inmates during a prayer as strong grounds to deny the proposed transfer. Manes Decl Ex. K at 2-3. Subsequent memos, such as the "CMU Referral" dated May 2, 2013, show that BOP staff considered Jayyousi's completion of in-prison education courses, clear conduct for the past 8 years, and lack of incident reports as key factors justifying a transfer out of the CMU. *Id* at 12.

Because the techniques and procedures allegedly implicated by BOP's redactions are in the public domain, BOP cannot invoke the protection of Exemption 7(E) to justify its withholdings.

Finally, none of the material that BOP has redacted relates to "law enforcement investigations or prosecutions" at all, but instead to routine prison management. *See supra* § II.A. By its terms, Exemption 7(E) does not permit withholding of any "techniques and procedures" or "guidelines" that a law enforcement agency happens to use, but only those used for "investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E). BOP fails to show how disclosure would reveal anything about how BOP conducts investigations or assists with prosecutions. For all of these reasons, BOP's redactions under Exemption 7(E) should be rejected in their entirety.

## III. BOP'S COMPLETE RELIANCE ON AN *EX PARTE* DECLARATION TO JUSTIFY CERTAIN REDACTIONS IS INCONSISTENT WITH FOIA.

BOP has refused to provide HRW with any meaningful public explanation for its redactions from the "Key Indicators" documents. *See* Gov't Br. 15; Stroble Decl. ¶ 30; Manes Decl. Ex. B. BOP's public declarations do not provide any inkling as to why BOP believes Exemptions 3, 7(E), and 7(F) apply, and BOP has refused even to identify the withholding statute(s) that it is relying upon under Exemption 3. Stroble Decl. ¶ 30. BOP has also failed to publicly explain why its entire justification must be kept secret, Gov't Br. 15, preventing HRW from mounting any meaningful adversarial challenge to BOP's claims.

BOP's approach is contrary to settled FOIA law, which strictly requires the fullest possible public justification for a redaction. *Lykins v. Dep't of Justice*, 725 F.2d 1455, 1465 (D.C. Cir. 1984). This Court "should not use *in camera* affidavits unless necessary and, if such affidavits are used, it should be certain to make the public record as complete as possible." *Id.* This Court should decline to conduct *in camera* review of *ex parte* declarations where the Government had not "provided the most thorough public explanation possible." *Lawyers Comm.*

*for Human Rights v. INS*, 721 F. Supp. 552, 568 (S.D.N.Y. 1989).  And BOP's reliance on *ex parte* justifications warrants special skepticism because the withheld information does not appear to implicate any national security exemptions. *See, e.g.*, *Campbell v. Dep't of Health & Human Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982) ("This court has expressed grave reservations regarding nonpublic government presentations absent sensitive national security concerns.").

   BOP has patently failed to provide the most thorough public explanation possible. BOP's *Vaughn* Index on the Key Indicators documents merely recites part of FOIA's statutory language, stating only that the information redacted under Exemptions 3, 7(E), and 7(F) is "law enforcement information" and "protected by statute," Stroble Decl. Ex. 2, at 1. This is obviously insufficient. *See El Badrawi v. Dep't of Homeland Sec*, 583 F. Supp. 2d 285, 313 (D. Conn. 2008) ("*Vaughn* indices [that] merely restate statutory language… lack the specificity necessary for the court to engage in *de novo* review.").

   Even more outrageous is BOP's decision to keep secret the statutory provision that it is invoking to withhold information. Exemption 3 protects documents "specifically exempted from disclosure" under a narrowly defined group of statutes. 5 U.S.C. § 552(b)(3). By failing to identify any withholding statute(s), BOP has prevented HRW from even offering a threshold challenge about whether the statute(s) come within Exemption 3. BOP has cited no precedent to justify this withholding.[17]  BOP's failure to disclose the withholding statute is plainly unlawful.

   Similarly, BOP's refusal to provide a public justification means that, in challenging BOP's Exemptions (7)(E) and 7(F) claims, "[t]he best [HRW] can do is to argue that the

---

[17] Neither of the cases BOP cites supports its extreme view that it can forego providing more public justification. In *Life Extension Foundation, Inc. v. IRS*, 915 F. Supp. 2d 174 (D.D.C. 2013), IRS publicly identified 26 U.S.C. § 6103(a) as an Exemption 3 statute before filing *ex parte* declarations. *Id.* at 181. IRS also identified the content of the redacted information and submitted a public declaration to explain the withholding. *Id.* In *Muslim Advocates v. Dep't of Justice*, the Government submitted a public version of the *ex parte* declaration that explained in detail the type of internal procedure redacted and how individuals could use that procedure to circumvent the law pursuant to Exemption 7(E). 833 F. Supp. 2d 106, 109 (D.D.C. 2012). BOP has provided no such information.

exception is very narrow." *Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973) (requiring

public justifications in order to permit meaningful adversarial scrutiny).[18] BOP may well be

misapplying Exemptions 7(E) and 7(F) in its *ex parte* declaration. As detailed above, there are

strict limits on the scope of Exemption (7)(E).  *Supra* § II.C.  Exemption 7(F), which protects

law enforcement records that "could reasonably be expected to endanger the life or physical

safety of any individual," has also been narrowly construed. 5 U.S.C. § 552(b)(7)(F).[19]

Because the *ex parte* Stroble declaration has impeded the adversarial process, HRW

respectfully asks the Court to require BOP to provide a more detailed public justification. *See,*

*e.g.*, *Lawyers Comm.*, 721 F. Supp. at 568 (ordering CIA to provide a public summary of its

affidavits). The Court should also conduct *in camera* review of these documents. *See infra* § V.

## IV. BOP HAS IMPROPERLY WITHHELD AND REDACTED DOCUMENTS ON THE GROUNDS THAT THEY ARE "NON-RESPONSIVE."

Without citing any authority in the statute's text, the Government has redacted records on

the ground that particular words and phrases found therein are "non-responsive" to HRW's

FOIA request. In doing so, the Government is asking this Court to read into FOIA a power the

statute explicitly denies. FOIA "mandates disclosure of records … unless the documents fall

within the enumerated exemptions." *Dep't of the Interior v. Klamath Water Users Prot. Ass'n*,

532 U.S. 1, 7 (2001). If *portions* of a record fall within an exemption, the government may redact

the record, disclosing "any reasonably segregable portion of a record . . . after deletion of the

---

[18] The public Stroble Declaration addresses only the *threshold* Exemption 7 question for the Key Indicators documents. Stroble Decl. ¶ 30. As shown, *supra* § II.A, it fails to establish that these redactions meet that threshold.
[19] Under Exemption 7(F) the Government must show "with sufficient specificity" that disclosure can reasonably be expected to endanger the safety of any individual. *Long v. Dep't of Justice*, 450 F. Supp. 2d 42, 80 (D.D.C. 2006), *amended further on reconsideration*, 479 F. Supp. 2d 23 (D.D.C. 2007). The Second Circuit has held that "an agency must identify at least one individual with reasonable specificity and establish that disclosure of the documents could reasonably be expected to endanger that individual" to meet the Exemption 7(F) standard. *ACLU v. Dep't of Defense*, 543 F.3d 59, 71 (2d Cir. 2008) (vacated and remanded on other grounds by *Dep't of Defense v. ACLU*, 558 U.S. 1042 (2009)).

portions which are *exempt under this subsection*." 5 U.S.C. § 552(b) (emphasis added).  Any

such redactions must be labeled with "the exemption under which the deletion is made." *Id.*

"Non-responsiveness" is not an exemption under 5 U.S.C. § 552(b), and FOIA explicitly forbids

reading into the law additional, unenumerated limits on disclosure. See 5 U.S.C. § 552(d).

The Government's position is at odds with DOJ's own FOIA guidance. DOJ has

instructed that "[f]irst and foremost, information should not be determined to be beyond the

scope of a request on less than a page-by-page basis" and that "if any of the information on a

page of a document falls within the subject matter of a FOIA request, then that entire page

should be included as within the scope of the request." Manes Decl. Ex. L, at 3.  Here, BOP has

violated that guidance, redacting a handful of words or phrases on specific pages as ostensibly

outside the scope of HRW's request. Moreover, DOJ's guidelines state that "the requester should

be fully informed of any 'scoping' determination . . . in any instance in which a requester

disagrees, the document pages involved should be included without question by the agency." *Id*.

Here, the Government only informed HRW of its apparent "scoping" determination when it

actually produced the redacted documents and a draft *Vaughn* index during the pendency of this

litigation. Manes Decl. ¶¶ 47-50. HRW specifically objected to these redactions in subsequent

discussions. *Id.* ¶ 48. But rather than turn over the material as DOJ policy requires, BOP's

summary judgment motion persists in defending these unlawful redactions.

In those rare cases where agencies have made similar efforts to redact non-exempt

information, district courts have balked. *See, e.g.*, *ACLU of N. Cal. v. Dep't of Justice*, __ F.

Supp. 3d __, 2014 WL 4954277, at 15 (N.D. Cal. 2014): *Am. Immigration Council*, 950 F. Supp.

2d at 248 ("[J]ustifications for FOIA withholdings are confined to the Act's nine narrowly

tailored exemptions [citation omitted]. Unless Defendants indicate the applicable exemption(s) . .

. this Court will have no choice but to compel disclosure"). This is for good reason: redacting non-exempt portions of responsive documents subverts the structure of FOIA, making it less efficient for both agency and requester. Here, the information contained in the responsive documents is not exempt, so the Government's position requires HRW to waste court and agency resources by filing a new suit to seek documents that an agency cannot legally withhold. The Court should not allow BOP to frustrate the FOIA process in this way.

Indeed, the only time a circuit court has even considered an attempt to redact records as non-responsive, it has strongly indicated that no such authority exists under FOIA. *Dettmann v. Dep't of Justice*, 802 F.2d 1472, 1476 (D.C. Cir. 1986). And as with the DOJ's guidance, the D.C. Circuit's opinion in *Dettmann* suggests that the agency must turn over complete documents when a plaintiff contests non-responsiveness determinations. *Id.* at 1476. Here, the records in question were clearly within the scope of the request, and HRW has specifically asked for disclosure of the redacted material.  Manes Decl. ¶¶ 48-50.

In addition, BOP has apparently now determined that certain documents originally released in response to the Joint Stipulation ordered by this Court actually fall outside the scope of the request. Stroble Decl. Ex. 2, at 3 (footnote). BOP has declined to include those documents in its *Vaughn* index or defend the redactions in those records. HRW disagrees that the documents are outside the scope of its request and, consistent with *Dettmann* and DOJ's Guidance, request disclosure of those records in full, or a *Vaughn* index justifying redactions. Manes Decl. ¶ 50.

V.     **THE COURT SHOULD CONDUCT *IN CAMERA* REVIEW.**

In the event this Court is not inclined immediately to order disclosure of the withheld material, HRW respectfully asks this Court to conduct an *in camera* review of the underlying documents. Courts have broad discretion to "examine the contents of such agency records *in*

24

*camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B). "The ultimate criterion is simply this: whether the district judge believes that *in camera* inspection is needed." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). "[I]n an effort to compensate" for the informational disadvantage between the Government and the requester, courts "often [do] examine the document *in camera*." *Vaughn,* 484 F.2d at 825. "In cases that involve a strong public interest in disclosure," there is "a greater call for *in camera* inspection." *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980). This Court has previously exercised this discretion and conducted *in camera* review of withheld documents. *See, e.g*, *Lawyers' Comm.*, 721 F. Supp. at 566. (Ordering FBI to submit documents for *in camera* review due to deficient explanations.)

In this case, *in camera* review of the withheld documents is appropriate. Such review would make up for HRW's informational disadvantage, particularly with respect to the redactions at issue in the *ex parte* Stroble declaration.  The Government's redactions pursuant to Exemptions 6, 7(C), and 7(E) also warrant *in camera* review because of the highly speculative and abstract character of BOP's justifications and the strong public interests at stake.

## <u>CONCLUSION</u>

For these reasons, Plaintiff's motion for summary judgment should be granted.  This Court should order BOP to disclose all of the challenged redactions or, at a minimum, the Court should conduct an *in camera* review of the documents in order to make an independent determination of the lawfulness of BOP's redactions.

Respectfully submitted,

/s/Jonathan Manes
Jonathan Manes, Supervising Attorney
David A. Schulz, Supervising Attorney
Nicholas Handler, Law Student Intern
Raymond Lu, Law Student Intern
Ajay Ravichandran, Law Student Intern
Alexander Resar, Law Student Intern
Rumela Roy, Law Student Intern
MEDIA FREEDOM AND INFORMATION
ACCESS CLINIC, YALE LAW SCHOOL[20]
P.O. Box 208215
New Haven, CT 06520-8215
Tel: (203) 432-9387
Fax: (203) 432-3034
jonathan.manes@yale.edu
dschulz@lskslaw.com
nicholas.handler@clinics.yale.edu
raymond.lu@clinics.yale.edu
ajay.ravichandran@clinics.yale.edu
alexander.resar@clinics.yale.edu
rumela.roy@clinics.yale.edu

*Counsel for the Plaintiff*

Dated: April 6, 2015
New Haven, CT

---

[20] This memorandum has been prepared by the Media Freedom and Information Access Clinic, a program of the Abrams Institute for Freedom of Expression at Yale Law School. Nothing in this memorandum should be construed to represent the official views of the law school.