UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
                                                                          :
HUMAN RIGHTS WATCH,                                                       :
                                                                          :          13-CV-7360 (JPO)
                                          Plaintiff,                       :
                                                                          :          OPINION AND ORDER
                                  -v-                                      :
                                                                          :
DEPARTMENT OF JUSTICE FEDERAL BUREAU OF                                    :
PRISONS,                                                                   :
                                                                          :
                                         Defendant.                        :
------------------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

       In August 2012, Human Rights Watch submitted fifteen Freedom of Information Act

(FOIA) requests to the United States Department of Justice (DOJ) and Federal Bureau of Prisons

(BOP) seeking information about the detention conditions of individuals—especially American

Muslims—charged with or convicted of terrorism and terrorism-related offenses.  (Dkt. No. 1 at

¶¶ 1, 3.)  After initial disagreement over the Government's responses to the requests, the parties

agreed on April 24, 2014, to a joint stipulation as to the scope of the search and release of

responsive records.  (Dkt. No. 19.)  Pursuant to the stipulation, the Government produced further

records while claiming a statutory right to withhold certain exempt information.  In early 2015,

the parties cross-moved for summary judgment on the Government's withholdings.  (Dkt. Nos.

30, 40.)  The Court heard argument on the motions on August 6, 2015.  (*See* Dkt. No. 63.)  For

the reasons that follow, each cross-motion is granted in part and denied in part.

## I.    Factual Background

       Human Rights Watch is a global organization that researches and reports on human rights

issues.  (Dkt. No. 1 at ¶ 7.)  The FOIA requests in dispute here are part of a study of U.S.

practices involving the investigation, prosecution, and imprisonment of terrorism suspects.  (Dkt. No. 41 at 1.)  These FOIA requests pertain to two categories of information: information about restrictions imposed on prisoners accused of terrorism-related crimes and information about the treatment of American Muslims in prison.  According to the Complaint, Human Rights Watch believes that the government engages in improper and abusive conduct in its prosecution and confinement of American Muslims.  (Dkt. No. 1 at ¶ 12.)  On August 24, 2012, Human Rights Watch submitted ten FOIA requests to BOP and five to the National Security Division of DOJ, seeking information about the total number of individuals charged with or convicted of terrorism offenses, their pre- and post-conviction facility placement, and their detention in certain especially restrictive environments.  (*Id.* at ¶ 16.)  Those requests led to the instant Complaint, alleging that DOJ failed to make records available in violation of FOIA.  (*Id.* at ¶¶ 35-36.)

On January 31, 2014, BOP released 149 pages in response to the FOIA requests.  (Dkt. No. 19 at 3.)  DOJ released a total of 493 more pages in March and April 2014.  (*Id.*)  On April 24, 2014, by joint stipulation, BOP agreed to conduct further searches, which Human Rights Watch in turn agreed would constitute an adequate search in response to the FOIA requests.  (*Id.* at 4.)  Human Rights Watch also agreed not to challenge certain withholdings and redactions that would directly identify inmates, such as their name and date of birth.  (*Id.*)  BOP released further records pursuant to that stipulation.

DOJ and BOP redacted and withheld information from their releases under several of FOIA's exemptions.  The Government moved for summary judgment on February 23, 2015, and Human Rights Watch cross-moved for summary judgment on April 6, 2015.  (Dkt. Nos. 30, 40.)  The parties contest whether DOJ and BOP's withholdings were proper.  *See* 5 U.S.C. § 552(a)(4)(B) (giving this Court "jurisdiction to enjoin the agency from withholding agency

records and to order the production of any agency records improperly withheld from the complainant").

Five categories of information are at issue:

1. <u>CMU Spreadsheets</u>

The BOP released three spreadsheets containing information on the inmates housed in Communications Management Units (CMUs) at federal prisons in Marion, Illinois (USP Marion), and Terre Haute, Indiana (FCI Terre Haute).  (Dkt. No. 35 at 8-10.)  CMUs are housing units at federal prisons in which inmates are under 24-hour surveillance, their communications are recorded and monitored, and physical contact with others is forbidden.  (Dkt. No. 42 at 5.)

Two of the spreadsheets list inmates at the prisons, with an emphasis on ethnic background and offense conduct.  The spreadsheets contain a row for each inmate housed in the CMU, and columns for country of birth, citizenship, ethnicity, race, religion, language, date of assignment to the CMU, date of program review for the inmate, sentence, disciplinary infractions, and rationale for referral.  (Dkt. No 35 at 8-9.)  BOP redacted columns for the inmate's name, number, and known associations, as well as the inmate's Security Threat Group ("STG") assignment and offense conduct giving rise to the STG assignment.  (*Id.*)  An inmate's STG status is not known to the inmate and describes BOP's concern that the inmate or others pose a threat to the safety and security of the public, staff, and inmates.  (*Id.* at 11-12).  For example, an inmate's STG status might reflect the inmate's membership in a certain gang or conviction for a sex crime.  (Dkt. No. 51 at 3-4.)

The third spreadsheet lists inmates in CMUs as of November 25, 2013.  (Dkt. No. 35 at 10.)  This spreadsheet has twenty columns, most of which overlap with the other two spreadsheets, including "reason for CMU referral."  BOP released two additional columns of

3

information: whether the inmate was designated or redesignated to the CMU, and offense.  (Dkt. No. 60-1 at 7.)  BOP redacted columns for inmate associations, comments by prison officials, and STG and Case Management Coordinator ("CMC") status.  CMC status reflects the prison's decision that the inmate presents special needs for management, such as the inmate's need to be separated from a particular group.  (Dkt. No. 65 at 3-4.)

### 2. SAM Memoranda

DOJ released internal memoranda regarding its application of Special Administrative Measures ("SAMs") to particular inmates.  (Dkt. No. 33 at 6.)  SAMs are "restrictions which the Attorney General can request to limit inmate communications that might disclose classified information or facilitate serious acts of violence of terrorism."  (*Id.*)  For example, the Government may restrict visitors and the usage of mail and telephones.  (*Id.* at 7.)  From these memos, the Government redacted the inmates' crimes or alleged crimes, sentences, religions and nationalities, associates, facts supporting SAM restrictions, effective dates of the SAM, the U.S. Attorney's Office handling each case, information about the inmates' places of incarceration and visitors, information about the inmates' family, the inmates' locations, and facts relating to authorization and renewal requests—including the risks associated with declining to apply SAM restrictions to specific inmates. (*Id.* at 4-5; Dkt. No. 36 at 3-4.)

### 3. Religious Accommodation Memoranda

BOP released email requests from inmates at USP Marion and FCI Terre Haute sent to staff for Islamic religious accommodations, along with staff responses and other records regarding the dispositions of those requests.  (Dkt. No. 34 at 10-11.)  As relevant here, BOP redacted inmate job assignments, inmate cell assignments, BOP staff user IDs and file locations (which include identifying staff information), the name of one BOP staff member about whom

an inmate complained, and the name and address of a bookstore referenced by an inmate.  (*Id.* at 13.)

4.  Key Indicators Documents

BOP released two "Key Indicators" documents.  (Dkt. No. 35 at 18.)  These documents are from BOP's "Key Indicators" database, a system that provides high-level aggregate data to BOP managers based on monthly accumulations of certain data.  (*Id.* at 19; Dkt. No. 65 at 6.)  Released in response to Human Rights Watch's request for information about CMU capacity, the records are fact sheets for USP Marion and FCI Terre Haute describing the prisons' total number of inmates and rated capacity.  (Dkt. No. 35 at 19; *see* Dkt. No. 19 at 6.)  BOP redacted one box of information from one page of each of these documents, BOP000264 and BOP000265, and did not disclose any information about that box.

5.  Non-Responsive Information

Finally, BOP redacted information it considered non-responsive.  First, from the Islamic religious accommodation memoranda, BOP redacted information that did not "reflect or concern requests for [Islamic] religious accommodation or the disposition of such requests"—including, for example, requests for "other types of religious accommodation."  (Dkt. No. 35 at 20-21.)  Second, from the Key Indicators records, the government released information about the rated capacity of the CMUs, but redacted the total institutional capacity and special housing unit capacity, as well as information about changes to CMU capacity.  (Dkt. 35-2 at 1; *see* Dkt. No. 59 at 16.)

**II.   Discussion**

Congress enacted the Freedom of Information Act "to promote honest and open government and to assure the existence of an informed citizenry 'to hold the governors

accountable to the governed.'" *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1245 (4th Cir. 1994)).  Accordingly, FOIA "is to be 'construed broadly to provide information to the public in accordance with its purposes; for the same reason, the [statutory FOIA] exemptions from production are to be construed narrowly.'" *Id.*  "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009).  Nonetheless, "public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 167 (1985).  FOIA's "statutory exemptions are intended to have meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

The Government's decision to withhold records is reviewed de novo. *Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that" a FOIA exemption applies to the withheld records. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994); *see* 5 U.S.C. § 552(a)(4)(B).  The agency can sustain its burden through the use of affidavits and declarations, which are presumed to be made in good faith. *Carney*, 19 F.3d at 812.  If the material falls outside a FOIA exemption even on the agency's version of the facts, summary judgment in favor of Human Rights Watch is appropriate. *See Bloomberg L.P.*, 649 F. Supp. 2d at 271.

A.      **CMU Spreadsheets**

The Government argues that its redactions from the CMU spreadsheets are justified by FOIA exemptions 6 and 7(C).  It is mostly correct.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) protects "records or information compiled for law enforcement purposes" to the extent that production of the records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C). Exemption 7(C) differs from Exemption 6 in two respects.  It protects only information "compiled for law enforcement purposes."  And the disclosure need not "constitute" a "clearly" unwarranted invasion of personal privacy, but need only "reasonably be expected to constitute" an unwarranted invasion of privacy.  For documents compiled for law enforcement purposes, then, "Exemption 7(C) is more protective of privacy than Exemption 6."  *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 496 n.6 (1994).  Accordingly, if the Government successfully asserts Exemption 7(C), then there is no need to consider Exemption 6.  The Court focuses its analysis on Exemption 7(C).

The Exemption 7(C) analysis proceeds in three steps.  First, the Court asks whether the documents were "compiled for law enforcement purposes."  *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 294 (S.D.N.Y. 2011).  If that threshold is satisfied, the Court determines "whether there is any privacy interest in the information sought." *Assoc. Press v. U.S. Dep't of Defense*, 554 F.3d 274, 284 (2d Cir. 2009).  "[O]nce a more than *de minimis* privacy interest is implicated," the Court determines the applicability of the exemption by balancing "the public interest in disclosure" against the privacy interest.  *Id.* at 284-85.

7

### 1.    Compiled for Law Enforcement Purposes

Citing *Williams v. FBI*, 730 F.2d 882 (2d Cir. 1984), the Government argues that, because BOP is primarily a law enforcement agency, all BOP records are per se compiled for law enforcement purposes.  (Dkt. No. 50 at 2).  *See Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188, 1197 (10th Cir. 2011) (citing *Williams*, 730 F.2d at 884).  In the Court's view, the Second Circuit's decision in *Williams* does not require the per se rule BOP seeks.  To the extent that *Williams* stands for that broad proposition, the Second Circuit has not repeated it in the last thirty years, and the Government cites no case from this district applying it.

Relying on *Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982), Human Rights Watch argues that, to be "compiled for law enforcement purposes," a record must be related to the enforcement of federal laws in such a way that the government can identify (1) "a particular individual or a particular incident as the object of [the agency's] investigation," (2) a connection "between that individual or incident and a possible security risk or violation of federal law," and (3) a "nexus" between the investigation and the agency's law enforcement duties.  *Id.* at 420-21.  (Dkt. No. 41 at 8-9).  Records of BOP's routine prison administration and inmate monitoring, the argument goes, are not related to any investigation into violations of the law.  *See Benavides* v. *Bureau of Prisons*, 774 F. Supp. 2d 141 (D.D.C. 2011) (prison telephone billing records not compiled for law enforcement purposes); *Maydak v. Dep't of Justice*, 362 F. Supp. 2d 316, 321-24 (D.D.C. 2005) (same for records of inmate recreation, staff names and positions, and inmate psychological profiles).

Congress amended FOIA since the D.C. Circuit decided *Pratt*, removing a requirement that the records be "investigatory."  *See Keys v. U. S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987) (citing Pub. L. No. 99-570, § 1802(a) (Oct. 27, 1986)).  Human Rights Watch argues

that this amendment simply expanded Exemption 7 to cover procedures and guidelines for prosecution and investigation, in addition to records compiled in the course of an individual prosecution. (Dkt. No. 59 at 2-3). *See, e.g.*, *Tax Analysts v. I.R.S.*, 294 F.3d 71, 79 (D.C. Cir. 2002); *see also Cox v. U.S. Dep't of Justice*, 576 F.2d 1302, 1310 (8th Cir. 1978). Some courts have continued to apply the *Pratt* test as Human Rights Watch describes it. *See, e.g. King v. U.S. Dep't of Justice*, 830 F.2d 210, 229-30 (D.C. Cir. 1987); *Electronic Privacy Info Ctr. v. Dep't of Justice Criminal Div.*, No. CV 12-127 (BJR), 2015 WL 971756, at *6-7 (D.D.C. Mar. 4, 2015).

The Second Circuit has not explained its understanding of the term "compiled for law enforcement purposes." *Families for Freedom*, 837 F. Supp. 2d at 294. But FOIA does not require as wooden a test as the one offered by Human Rights Watch. *See John Doe Agency*, 493 U.S. at 157 ("This Court consistently has taken a practical approach when it has been confronted with an issue of interpretation of [FOIA]."). As the D.C. Circuit has explained, "Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law." *Pub. Emp. for Env't'l Responsibility (PEER) v. U.S. Section, Int'l Boundary and Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014). The "ordinary understanding" of the term "includes . . . proactive steps designed to prevent criminal activity and maintain security." *Id.* (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring)). Law enforcement records that are not investigatory include plans to prevent attacks on dams at the U.S.-Mexico border and to ensure dam security in emergencies, *id.* at 204, plans to prevent the use of radio-activated improvised explosive devices, *Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 523 (D.C. Cir. 2015), and settings in which the "[p]olice [are] on the beat," *Milner*, 562 U.S. at 582 (Alito, J., concurring). This broader, commonsense understanding of "law enforcement purposes" need not and does not embrace all BOP records.

9

*Cf., e.g.*, *Maydak*, 362 F. Supp. 2d at 323 (deciding that lists of staff members and titles at a federal prison were not compiled for law enforcement purposes).  To acknowledge that "law enforcement purpose" defies rigid formulation, then, is not to allow all information about BOP administration and procedure to satisfy the Exemption 7 threshold.

Human Rights Watch challenges the redaction of the columns for STG assignment, offense conduct giving rise to STG assignment, association (which contains information related to STG status (Dkt. No. 51 at 2)), comments by prison officials, and Case Management Coordinator ("CMC") status.  Each of these columns contains information "compiled for law enforcement purposes."  STG assignments are "a tool used to monitor and track inmates who pose unique security threats," such as "associations with gangs or terrorist organizations and sex offender status."  (*Id.* at 2-3.)  This kind of monitoring and tracking is classic proactive activity undertaken to "prevent criminal activity and maintain security."  *PEER*, 740 F.3d at 203.  Similarly, the conduct giving rise to STG status is "investigative in nature" and elaborates on the STG assignment.  (Dkt. No. 51 at 3; Dkt. No. 52 at 2.)  The "Comments" column "includes details such as aliases and some references to" STG assignments.  (Dkt. No. 53 at 4.)  CMC assignments, similarly, identify prisoners who pose special security risks for management, like the need to be separated from particular groups of inmates or the fact that they are disruptive.  Indeed, when describing the public interest in disclosure of this information, Human Rights Watch characterizes it as a "matter of *substantive law enforcement policy*."  (Dkt. No. 41 at 14 (emphasis added).)

### 2.    Privacy Interest

The Court next considers whether there is more than a *de minimis* privacy interest at stake.  *Assoc. Press*, 554 F.3d at 284-85.  An inmate has a privacy interest in "personal facts" to

10

be kept "away from the public eye." *Id.* at 286.  That interest is "particularly pronounced where disclosure could lead to embarrassment or retaliation." *Id.*

The privacy interests here are more than *de minimis*.  First, many inmates in the CMU are not known to be in the CMU by the general public.  (Dkt. No. 65 at 19.)  Second, anyone who knows that a particular individual is in a CMU—a current or former inmate, a friend or associate, and in some cases members of the public—may be able to identify the inmate's row of the spreadsheet based on the already-released information, like citizenship and sentence.  (*Id.* at 20.) *See Dep't of Air Force v. Rose*, 425 U.S. 352, 380 (1976) ("[W]hat constitutes identifying information regarding a subject [] must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar" with the subject's background.).  In either case, even though the information sought does not identify an inmate by name or number, a reader could put together the mosaic of information about each inmate, identify them, and learn other personal information about them—including, if the redacted information is released, their STG assignment and BOP's comments about them.  The privacy interests in that information are especially strong if it identifies the inmate as a sex offender, gang member, or other category of person vulnerable to harm in prison.

Human Rights Watch argues that there is no privacy interest at stake.  The information Human Rights Watch seeks, it observes, does not explicitly identify any inmate by name or number.  In its view, any suggestion that the inmates can be identified from disclosure of their STG status or the other redacted information is too speculative.  *See Rose*, 425 U.S. at 380 n.19 (1976) (explaining that Exemption 6 "was directed at threats to privacy interests more palpable than mere possibilities").  For support, Human Rights Watch cites *ACLU v. U.S. Dep't of Homeland Security*, 973 F. Supp. 2d 306 (S.D.N.Y. 2013), in which the court rejected the

11

Government's attempt to withhold records about certain immigration detainees.  The
Government redacted data about individual detainees' detention status and criminal history,
under a mosaic theory similar to the government's theory here.  *Id.* at 314-15.  In that case,
however, the records covered 22,000 detainees.  (Dkt. No. 50 at 9 n.8.)  The court found that it
unlikely that anyone would review the records and be familiar with enough background
information—for example, the set of Liberian detainees in a small town—to identify an
individual's record.  *ACLU*, 973 F. Supp. 2d at 315-16.  Here, in contrast, there are roughly 50
people in each of the two CMUs.  (Dkt. No. 43-2.)  The concern that someone might review the
list of 50 people in a CMU and identify an individual person's row of information is not only
plausible, but substantial.

### 3.    Balancing with the Public Interest

To determine whether the documents in question "could reasonably be expected to
constitute an unwarranted invasion of personal privacy," the Court must weigh the privacy
interest against the public's interest in disclosure.  *Assoc. Press*, 554 F.3d at 284.  "[T]he *only*
relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the
information sought would shed light on the agency's performance of its statutory duties or
otherwise let citizens know what their government is up to."  *Amnesty Int'l USA v. CIA*, 728 F.
Supp. 2d 479, 523 (S.D.N.Y. 2011) (quoting *Bibles v. Or. Natural Desert Assoc.*, 519 U.S. 355,
355-56 (1997)).

Human Rights Watch identifies two relevant expressions of this public interest.  First,
citizens have an interest in understanding "how BOP's special prison restrictions work," and
"[p]ublicly available criteria for placing inmates in CMUs . . . are so vague as to be
meaningless."  (Dkt. No. 41 at 13.)  Second, the public has an interest in determining whether

12

BOP is using the CMU program to discriminate against Muslims.  (*Id.* at 14-15; Dkt. No. 59 at

8.)  As to this latter interest, and contrary to the Government's assertions, Human Rights Watch

has "produce[d] evidence that would warrant a belief by a reasonable person that the alleged

Government impropriety *might* have occurred."  *Nat'l Archives & Records Admin. v. Favish*, 541

U.S. 157, 174 (2004); *see Union Leader Corp. v. DHS*, 749 F.3d 45, 56 (1st Cir. 2014).  Through

interviews, Human Rights Watch has cataloged plausible allegations of arbitrary and

discriminatory treatment of Muslim prisoners.  (Dkt. No. 42-1 at 139-41).  It has also compiled

reports of harsh conditions in CMUs, whose populations are two-thirds Muslim.  (*Id;* Dkt. No.

42 at 5.)

These public interests are significant.  But this step of the inquiry focuses "not on the

general public interest in the subject matter of the FOIA request, but rather on the incremental

value of the specific information being withheld."  *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C.

Cir. 2003).  Human Rights Watch has not adequately shown that incremental information on

STG status, associations, and CMC status is itself significant.  The Government has already

released the "Reason for CMU referral" column of the spreadsheets, as well as information about

sentence and offense.  That information will help shed light on how BOP's special prison

restrictions work.  To the extent that Human Rights Watch suspects that BOP discriminates in its

assignment of people to CMUs, BOP has released a variety of demographic information about

the inmates: race, religion, citizenship, and country of birth.  It is certainly possible that STG

status, for example, is a factor in the government's decision to assign someone to a CMU.  But

there is no evidence that it is a significant factor, much less a significant factor in a way not

otherwise captured by the "Reason for CMU referral" column.

For most of the redacted information in the CMU spreadsheets, the incremental public interest at stake is relatively slight. The Government has demonstrated that the privacy interests at stake are substantial.  Accordingly, the Government has carried its burden.

The Court reserves judgment as to one column: the "Comments" column in the historical spreadsheet.  As Human Rights Watch rightly observes, the Government is obligated to segregate exempt information and disclose all other information.  (Dkt. No. 59 at 6-7.)  *See* 5 U.S.C. § 552(b); *Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81, 85-6 (2d Cir. 1991).  The other columns either contain only exempt information or information that cannot be segregated: for the Government to release the STG column, for example, except where it includes information about gang membership is for the Government to flag all gang members.  The Comments column, however, likely contains some nonexempt information segregable from exempt information.  The Government defends its redaction of this column by saying that it contains "*[s]ome* references to STG assignments, and to associations and conduct related to STG assignments."  (Dkt. No. 51 at 2 (emphasis added); *see* Dkt. No. 50 at 16.)  Presumably, some information in the column falls within the privacy exemptions, but some does not.  The Government has not demonstrated that it has released all of the "reasonably segregable" information.

The Government must provide an unredacted version of the "Comments" column from the historical CMU spreadsheet for the Court's *in camera* review.  *See Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 82 (2d Cir. 2002).  The Government may also file an affidavit with its own detailed, line-by-line segregability analysis.  With respect to the remaining portions of the CMU spreadsheets, the Government's Motion for Summary Judgment is granted, and Human Rights Watch's Cross-Motion for Summary Judgment is denied.  Because the Court finds redaction

14

proper under Exemption 7(C), it need not address the Government's arguments under Exemption 7(E), the exemption for law enforcement procedures, or its belated argument under 7(F), the exemption for safety.  (Dkt. No. 50 at 16-17 & n.12 (limiting the Exemption 7(E) argument to STG information); Dkt. No. 50 at 20.)

> ### B.   SAM Memoranda

The Government also invokes Exemptions 6 and 7(C) for the SAM memoranda.  Human Rights Watch challenges the Government's redaction of inmates' crimes or alleged crimes, sentences, facts concerning associates that support SAM restrictions, effective dates of the SAM, the U.S. Attorney's Office handling each case, information about the inmates' places of incarceration and visitors, information about the inmates' family, the inmates' locations, and facts relating to authorization and renewal requests—including the risks associated with declining to apply SAM restrictions to specific inmates. (Dkt. No. 33 at 5; Dkt. No. 36 at 3-4.)

The SAM memoranda satisfy the Exemption 7(C) threshold easily.  They concern the Attorney General's decisions to impose, administer, and renew SAMs under 28 C.F.R. §§ 501.2 and 501.3.  (Dkt. No. 33 at 6-7; Dkt. No. 65 at 23.)  Those regulations permit the imposition of SAMs "that are reasonably necessary to prevent disclosure of classified information," *id.* § 501.2(a), or "that are reasonably necessary to protect persons against the risk of death or serious bodily injury," *id.* § 501.3(a).  Accordingly, these documents were created to "prevent criminal activity and maintain security"—law enforcement purposes.  *PEER*, 740 F.3d at 203.

The privacy interests at stake here are similar to those at issue for the CMU spreadsheets.  The inmates have two types of privacy interests: (1) for those not known to be subject to SAMs, an interest in hiding their SAM status, and (2) for all inmates, an interest in hiding the particular restrictions and reasons for those restrictions.  (Dkt. No. 65 at 23-24.)  These facts—especially

15

the reasons an inmate was subjected to SAMs—are private facts that individuals have an interest in keeping out of the public eye.  As with the CMU spreadsheets, the more information particular to a given inmate is released, the likelier it is that the inmate in a memo can be identified and linked to the descriptions and measures in the memo.  As of October 21, 2013, there were only eight persons subject to SAMs under § 501.2 and 46 persons subject to SAMs under § 501.3, and some of their cases are high-profile.  (Dkt. No. 64 at 2.)  The Court agrees with the Government that there is a substantial likelihood that an inmate could be identified as the subject of a memo if, for example, the inmate's crimes, the effective dates of the SAMs, and the risks of declining to apply SAM restrictions to that inmate were revealed.  Human Rights Watch observes that the Government has revealed the effective dates of SAMs elsewhere, listed by prison location and applicable CFR regulation.  (Dkt. No. 41 at 12 n.9; Dkt. No. 43-1; Dkt. No. 59 at 6.)  This does not undermine the privacy interest, but rather demonstrates the interest at stake: to reveal the effective dates or prison location in a SAM memorandum is to link the information in that memo to the information it has revealed elsewhere, raising the risk of identification.  The privacy interests are more than *de minimis*.

Balanced against these privacy interests is the public interest in understanding why SAMs are imposed and how they operate.  *See Amnesty Int'l USA*, 728 F. Supp. 2d at 523.  The public interest is especially strong, Human Rights Watch argues, because people aware of a given set of SAMs—like defendants and their attorneys—are often prohibited from discussing them.  (Dkt. No. 41 at 14.)  SAMs also affect a defense team's ability to prepare for trial, so the public has an interest in understanding the relationship between U.S. Attorney's Offices handling of pretrial inmates and SAMs.  (*Id.*)  Finally, Human Rights Watch argues that SAMs may be used in a discriminatory fashion against American Muslims.  (*Id.*)

16

As released, the SAM memoranda describe the specific SAMs imposed at length.  (*See, e.g.*, Dkt. No. 64-2 at 2-16.)  Some also contain descriptions of why the SAMs were imposed, but at a level of generality that makes it difficult for the inmate to be identified.  For example, one memo refers to an inmate's "longstanding commitment to jihad targeting Americans" and "communications to his family [from prison] that contained violent rhetoric and attempts to circumvent the SAM," including "letters that contained language soliciting or encouraging acts of violence."  (Dkt. No. 64-1 at 19.)  Another refers to the inmate's skill at "operational tradecraft and countersurveillance techniques," as well as his "combat experience [and] radical religious ideology."  (Dkt. No. 64-2 at 18.)  The memoranda contain little other information about the particular inmate's background, except some references to the facility at which the inmate is located.

The Court's focus is again on "the incremental value of the specific information being withheld."  *Schrecker*, 349 F.3d at 661.  Some of the redacted information, describing inmates' family members and visitors, is of little value to the public.  And other redacted information— the facts relating to SAM authorization and renewal, the effective dates of the SAM, facts concerning associates that support SAM restrictions, the inmates' places of incarceration or locations, along with their crimes and sentences—would make identification of the inmate in the SAM memo substantially more likely by revealing information specific to the inmate.  To be sure, release of that information may help the public better understand the SAM program's operation.  But Human Rights Watch has not articulated why the information released is *incrementally* valuable, beyond concerns that the extant information is too vague and a general statement of its use in "further investigation."  (Dkt. No. 41 at 15.)   It is not obvious, for example, that the public has a weighty interest in knowing not only that the SAM was imposed

17

because the inmate has a longstanding commitment to Islamic terrorism, but also that the inmate was convicted of material support for terrorism and is serving a lengthy sentence, or that the public has a weighty interest in knowing that a SAM was imposed because of an inmate's operational tradecraft and radical religious ideology, and also that the inmate is held at a particular federal prison.  HRW seeks more specificity as to the facts on which the Government relied or might have relied in making its SAM determinations.  Yet the additional information makes it likelier that the subject of a SAM memorandum can be identified out of the 54 people subject to SAMs. "Although under this rationale the public interest might be served, the speculative nature of the result is insufficient to outweigh the [inmates'] privacy interest in nondisclosure." *Assoc. Press*, 554 F.3d at 290.  The Court concludes that on balance the risk of identification is sufficiently great and the public benefit sufficiently amorphous that the invasion of privacy would "reasonably be expected to" be unwarranted.  5 U.S.C. § 552(b)(7)(C).

The balance tips in the opposite direction with regard to a final type of information: the U.S. Attorney's Office handling each case.  Human Rights Watch has described a specific public interest in identifying patterns in the way SAMs are requested by certain U.S. Attorneys' Offices.  (Dkt. No. 41 at 14; Dkt. No. 59 at 8 n.6.)  Release of this information will help the public understand "what" specific institutions of "the Government is up to"—specifically, which parts of the Government are seeking SAMs, and how often.  *Amnesty Int'l USA*, 728 F. Supp. 2d at 523.  The public interest in release of the U.S. Attorney's Office information is stronger than the interest in the other categories of information.  The invasion of privacy attendant to release of this information is warranted.  *See* 5 U.S.C. § 552(b)(7)(C).

The Court pauses here to note a feature of FOIA cases such as this.  It is not clear whether, as a general matter, inmate identification is more or less likely if U.S. Attorney's Office

information is released than if, say, the inmate's crime and sentence were released.  Having

ordered release of the U.S. Attorney's Office information because of the strong public interest in

the balance, however, the total mix of public information has changed.  The likelihood of

identification upon release of crime and sentence information is now greater, because that

information could be paired with both the already released information and to-be-released U.S.

Attorney's Office information.  Accordingly, privacy interests weigh more strongly against the

release of further information.

      The Government is ordered to release versions of the SAM memos without redactions

for the U.S. Attorney's Office handling each case.  With respect to the remaining information

from the SAM memoranda, the Government's Motion for Summary Judgment is granted, and

Human Rights Watch's Cross-Motion for Summary Judgment is denied.

### C.      Religious Accommodation Requests

      The Government also asserts that Exemptions 6 and 7(C) cover the religious

accommodation documents.  These documents are not "compiled for a law enforcement

purpose" within the meaning of Exemption 7(C).  Responses to requests for religious

accommodation concern routine issues of prison administration, and any Government purpose of

preventing criminal activity or maintaining public security is attenuated.  *See Benavides*, 774 F.

Supp. 2d at 147; *Maydak*, 362 F. Supp. 2d at 322-24.  As explained above, the law of this circuit

does not support a per se exemption for BOP as it operates the federal prison system.  *See* 18

U.S.C. § 3621(a).  (Dkt. No. 50 at 3.)  And in any event, the documents cannot meaningfully be

said to be *compiled* for a law enforcement purpose.  *See Milner*, 562 U.S. at 584-85 (Alito, J.,

concurring) (citing *John Doe Agency*, 493 U.S. at 154-55).   The documents were created to

respond to requests for religious accommodation and assembled as part of this FOIA request.

The Court turns to Exemption 6.  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The text establishes two requirements: the files must be of the type protected by the statute, and the public interests must clearly outweigh privacy interests. *See Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005).

Records can be similar to personnel files if they are specific to individuals and contain items of information concerning that person.  *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 196 (2d Cir. 2012).  The touchstone is not whether the records contain "only a discrete kind of personal information," but whether they contain information "which applies to a particular individual."  *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982).  "Similar files," then, includes Passport Office records, an investigation report, letters to detainees, and interview records, so long as they "contain[] personal information identifiable to a particular person." *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 174-75 (2d Cir. 2014).

The records here satisfy the Exemption 6 threshold.  They are maintained in inmates' Central Files with BOP and contain information about individual inmates' religious accommodation requests and BOP's responses to those requests.  (Dkt. No. 50 at 3.)

That is not the end of the matter.  Information within documents protected by Exemption 6 may be redacted if "disclosure would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  As with Exemption 7(C), the Court "balance[s] the public's need for the information against the individual's privacy interest."  *Wood*, 432 F.3d at 86.  Since the disclosure must "constitute" a "clearly" unwarranted invasion of privacy, however, the bar for withholding under Exemption 6 is higher.  *U.S. Dep't of Defense*, 510 U.S. at 496 n.6.

As noted above, BOP redacted inmate job assignments, inmate cell assignments, BOP staff user IDs and file locations, the name of one BOP staff member about whom an inmate complained, and the name and address of a bookstore referenced by an inmate. As to the latter three categories, employees in federal prisons—especially those stationed at the two federal CMUs—have an obvious privacy interest in their user IDs and names. *See Long*, 692 F.3d at 191-92; *Wood*, 432 F.3d at 88 ("This Court and others have recognized that government investigative personnel may be subject to harassment or embarrassment if their identities are disclosed."). The bookstore, referenced by an inmate, has a privacy interest in its name and address, and the fact that it was named by an inmate in a CMU. The inmate has a privacy interest in the inmate's connection to the bookstore. Regarding the public interest, the most that Human Rights Watch has said is that the information "will enable HRW to determine whether anti-Muslim bias affected how the[] [religious accommodation requests] were handled." (Dkt. No. 41 at 16.) It offers no specific suggestion as to how these pieces of information, if released, would incrementally enhance public understanding of the Government's treatment of Muslim prisoners. Accordingly, release of these three types of information would constitute an invasion of privacy, and that invasion is clearly unwarranted in light of the "negligible" public interest established by Human Rights Watch. *Wood*, 432 F.3d at 89.

As to inmate job and cell assignments, the Government is undoubtedly correct that that information is substantially likely to be identifying, at least to other inmates. (Dkt. No. 65 at 9-10.) Release of the information therefore constitutes some invasion of privacy. Further, the records at issue here contain detailed information about the requestor's religious beliefs, and an individual has a privacy interest in control of information about his or her religious beliefs. *See Assoc. Press*, 554 F.3d at 284. Human Rights Watch, however, explains that this information

21

advances the public interest.  It has collected evidence that BOP officials "may be imposing special burdens on Muslim inmates as retaliation," and contends that release of this information would reveal "whether inmates who seek religious accommodations are assigned especially burdensome jobs or living quarters."  (Dkt. No. 59 at 8 n.6.)  Having reviewed the Human Rights Watch report, the Court agrees that Human Rights Watch has made a plausible showing that such retaliation might have occurred.  *Favish*, 541 U.S. at 174.  (Dkt. No. 42 at 5-6; Dkt. No. 42-1 at 139-40.)  Muslim inmates and defense lawyers have reported harassment and retaliation, as well as poor prison conditions and limited opportunity to work.  The public has a significant interest in investigating those reports.  And, in light of the higher bar for Exemption 6 redactions, it cannot be said that the invasion of personal privacy would be "clearly unwarranted."  5 U.S.C. § 552(b)(6).

The Government's Motion for Summary Judgment and Human Rights Watch's Cross-Motion for Summary Judgment are granted in part and denied in part.  The Government must provide versions of the religious accommodations records without redactions for inmate job and cell assignments.

**D.  Other Records**

**1.  Key Indicators Documents**

The government asserts three exemptions for its redaction from the Key Indicators documents: Exemption 3 for matters exempted from disclosure by another statute, Exemption 7(E) for law enforcement techniques or procedures, and Exemption 7(F) for records the disclosure of which would endanger the life or physical safety of an individual.  5 U.S.C. §§ 552(b)(3), (b)(7)(E), (b)(7)(F).  (Dkt. No. 31 at 15-16.)  Because the Court finds the redactions permissible under Exemption 3, it need not consider the other exemptions.

22

Exemption 3 spares from disclosure records that are "specifically exempted" by another statute, if that statute:

> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
>
> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

*Id.* § 552(b)(3).  "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Ass'n of Ret. R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987); *see Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 71-72 (2d Cir. 2009) (describing the standards for the application of Exemption 3).

The Government redacted only one box from each of the Key Indicators documents. (Dkt. No. 43-2 at 2-3; *see* Dkt. No. 65 at 6.)  To explain, it has offered an ex parte declaration. (*See* Dkt. No. 37.)

The Court is mindful that the use of in camera affidavits in FOIA cases is discouraged, *see Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1465 (D.C. Cir. 1984), and that the Government should provide "the most thorough public explanation possible," *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 568 (S.D.N.Y. 1989).  The Court takes seriously Human Rights Watch's concern that the Government did not disclose even the predicate statutory provision it invokes to justify the exemption, preventing Human Rights Watch from challenging that invocation.

Nonetheless, having reviewed the ex parte declaration, the Court is satisfied that Exemption 3 applies to the redaction from the Key Indicators documents. Further in camera review of the unredacted documents is unnecessary and would be unhelpful. The Court also agrees with the Government that redaction of the statute requiring this withholding is justified. With respect to the Key Indicators documents, the Government's Motion for Summary Judgment is granted, and Human Rights Watch's Cross-Motion for Summary Judgment is denied.

### 2.    Non-Responsive Information

Finally, the Government and Human Rights Watch debate the propriety of withholdings the Government has identified as nonresponsive. In the Government's view, it has "no obligation to produce information that is not responsive to a FOIA request." *Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 156 (D.D.C. 2010), *aff'd,* 2010 WL 5479580 (D.C. Cir.). In Human Rights Watch's view, the Government has identified responsive records, and it is trying to redact portions of those records without identifying an applicable FOIA exemption. *See Dep't of the Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 7 (2001).

This might be a difficult case if the Government had surgically excised nonresponsive portions of a responsive document, removing helpful context. Such a case would implicate a difficult conceptual question: FOIA requires the Government to release requested "records." 5 U.S.C. § 552(a)(3)(A). The Court would have to determine whether the statutory term "record" encompasses only the responsive terms, or also the sentences, paragraphs, pages (or other unit) that contain responsive terms. The parties have offered little law or argument about the proper interpretation of the text of FOIA.

But this is not such a case. From the religious accommodation records, the Government redacted generally at the page- and paragraph-level information concerning religious

accommodation requests for other religions or requests that did not pertain to religious accommodations at all.  (Dkt. No. 43-3; Dkt. No. 60-3.)  For example, one redaction is discussion of an inmate's access to the electronic law library.  (Dkt. No. 60-3 at 8.)  The information in those redactions is clearly outside the scope of this FOIA request, which sought "records of requests for Islamic religious accommodation."  (Dkt. No. 18-1 at ¶ 9.)   It is "common sense" that allowing withholding of large pieces of otherwise-responsive records "avoids routine, potentially wasteful disclosure of enormous amounts of material that bear no relationship whatsoever to the focus of a FOIA request."  *Dettman v. U.S. Dept' of Justice*, 802 F.2d 1472, 1476 n.5 (D.C. Cir. 1986).  Human Rights Watch has identified little authority—and none from this circuit—for the proposition that the Government must release entire documents if any portion, however small, is responsive to a FOIA request.  *Cf. Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 30 F. Supp. 3d 67, 73 (D.D.C. 2014) (allowing withholding of a "record" consisting of nonresponsive pages of a larger document); *Dettman*, 802 F.2d at 1475-76 (expressing concern about the Government's "parsimonious" reading of a request for "all *documents*" (emphasis added)).  Should Human Rights Watch want these documents in full, it need only ask for them.

The "nonresponsive" Key Indicators information, in contrast, was in fact responsive and should have been disclosed.  Human Rights Watch requested "records reflecting the inmate capacity of the CMUs" at USP-Marion and FCI Terre Haute. (Dkt. No. 18-1, at ¶ 8.)  The Government released the "rated capacity" of the CMUs, but redacted the "total institution capacity" and "special housing unit capacity." (Dkt. No. 35-2, at 1; Dkt. No. 60-3.)  The redacted information "reflect[s] the inmate capacity" and falls within the FOIA request.

The Government's Motion for Summary Judgment and Human Rights Watch's Cross-Motion for Summary Judgment are granted in part and denied in part. The Government is ordered to release the Key Indicators documents (BOP000260-63) without redacting inmate capacity.

## IV.    Conclusion

For the foregoing reasons, the parties' cross-motions for summary judgment are GRANTED IN PART and DENIED IN PART:

1. The Government shall transmit to the Court an unredacted version of the Comments column of the Historical CMU Spreadsheet for the Court's segregability analysis. The Government may also file an affidavit with its own detailed, line-by-line segregability analysis.

2. The Government shall release the SAM memoranda without redactions for the U.S. Attorney's Office handling each case.

3. The Government shall release the religious accommodations records without redactions for inmate job and cell assignments.

4. The Government shall release the Key Indicators documents without the "non-responsive" redactions for inmate capacity.

The Clerk is directed to close the motions at docket entries 30 and 40.

IT IS SO ORDERED.

Dated: September 16, 2015
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

26